1  **FARUQI & FARUQI, LLP**
   VAHN ALEXANDER (167373)
2  CHRISTOPHER HAYES (277000)
   10866 Wilshire Boulevard, Suite 1470
3  Los Angeles, California 90024
   Telephone: (424) 256-2884
4  Facsimile: (424) 256-2885
   Email: valexander@faruqilaw.com
5       chayes@faruqilaw.com
6
   *Attorneys for Plaintiff*
7

8              UNITED STATES DISTRICT COURT
9           NORTHERN DISTRICT OF CALIFORNIA
10

   **CV12 - 00707 HRL**

11 NATALIE GORDON, Derivatively, on          Case Number _____
   Behalf of Nominal Defendant Netflix, Inc.,
12
13                    Plaintiff,             **VERFIED SHAREHOLDER
                                             DERIVATIVE COMPLAINT**
14         v.

15 REED HASTINGS, LESLIE KILGORE,
   DAVID WELLS, RICHARD BARTON,
16 A. GEORGE BATTLE, CHARLES
   GIANCARLO, TIMOTHY HALEY, JAY           **JURY TRIAL DEMANDED**
17 HOAG, NEIL HUNT, PATTY MCCORD,
   DAVID HYMAN, TED SARANDOS, and
18 ANN MATHER,
19                    Defendants,
20         -and-
21 NETFLIX, INC.,
22                    Nominal Defendant.
23
24
25
26
27
28

                VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff by the undersigned attorneys, submits this Verified Shareholder Derivative Complaint setting forth allegations against defendants named herein.

## NATURE OF ACTION

1.      This is a verified shareholder derivative complaint brought on behalf of nominal defendant, Netflix, Inc. ("Netflix" or the "Company"), against certain of the Company's officers and members of its Board of Directors (the "Board") for breach of fiduciary duty, abuse of control, corporate waste, and unjust enrichment.  The Individual Defendants (as defined below) breached their fiduciary duties by causing Netflix to buyback Company stock at artificially inflated prices, to the detriment of the Company and its shareholders.  Moreover, the Individual Defendants' breaches directly resulted in financial benefits to themselves.

2.      Between the start of 2007 and June 30, 2011, Netflix generated $507 million in free cash flow.  Yet over that same period, as the Company's stock soared, it spent $994 million buying back shares.

3.      Over the last year and a half or so, Netflix has traded with a P/E of between 60 and 90.  Despite this, the Board and the Company's officers decided to spend all of the Company's earnings on share buybacks.  In the last one and a half years, Netflix has earned $290 million; but spent $305 million on buybacks over this same period.

4.      Since the very end of the 2010 fiscal year alone, Netflix has spent approximately $295 million buying back the Company's stock.  These buybacks occurred on December 31, 2010, when the share price was at $175.70, March 31, 2011, when the share price was at $237.78, June 30, 2011, when the share price was at $262.69, and September 30, when the share price was at $113.27.  Since that time, Netflix shares have traded at a price as low as $63.86.

5.      To make matters worse, during this same time period, it was clear to the Individual Defendants that Netflix could not sustain the growth it had previously enjoyed.  The main reasons for this were foreseeable increased subscription costs in the face of increasing content costs, and the knowledge that Netflix would no longer have access to premium content from Liberty Starz

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Group ("Starz"). This was a reality which Netflix sought to combat by segregating its DVD by
2  mail and streaming services into two distinct entities, a move decried by its subscribers.

3      6.    Meanwhile, Netflix's insiders, including the Individual Defendants, continued to
4  profit from the Company's inflated share price, having engaged in the sale of over $1 billion worth
5  of Netflix stock over the last two years.

6                    **JURISDICTION AND VENUE**

7      7.    This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §
8  1332(a)(2) because complete diversity exists between Plaintiff and each defendant, and the amount
9  in controversy exceeds $75,000. This is not a collusive action designed to confer jurisdiction on a
10  court of the United States that it would not otherwise have.

11     8.    This Court has jurisdiction over each defendant named herein because each defendant
12  is either a corporation that conducts business in and maintains operations in the State of California,
13  or is an individual who has sufficient minimum contacts with the State of California so as to render
14  the exercise of jurisdiction by this Court permissible under traditional notions of fair play and
15  substantial justice. Netflix is headquartered in California, and because the allegations contained
16  herein are brought derivatively on behalf of Netflix, defendants' conduct was purposefully directed
17  at California. The exercise of jurisdiction over any non-resident defendant is reasonable under
18  these circumstances.

19     9.    Venue is proper in this Court because, although Netflix is a Delaware corporation,
20  one or more of the defendants either resides in or maintains executive offices in this District and, a
21  substantial portion of the transactions and wrongs complained of herein, occurred in this District.
22  In addition, defendants have received substantial compensation in this District by doing business
23  here and engaging in numerous activities that had an effect in this District.

24
25
26
27
                                           3
28                      VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**PARTIES**

10.  ·Plaintiff, Natalie Gordon, a citizen of the state of New York, is a shareholder of Netflix, was a shareholder of Netflix at the time of the wrongdoing alleged herein, and has been a shareholder of Netflix continuously since that time.

11.  Nominal Defendant Netflix is a Delaware corporation with its principal executive offices located at 100 Winchester Circle, Los Gatos, California 95032. With more than 25 million members worldwide, Netflix is the world's leading Internet subscription service for enjoying movies and TV shows.

12.  Defendant Reed Hastings ("Hastings") is the Chief Executive Officer ("CEO"), President, and Chairman of the Board of Netflix. Hastings is a Hastings founded Netflix in 1997 and launched the subscription service in 1999. Earlier in his career, Hastings founded Pure Software, which he built into one of the world's 50 largest public software companies. After a successful public offering and a number of acquisitions, Pure was acquired by Rational Software in 1997. In March 2007, Hastings was appointed to Microsoft Corp.'s board of directors. He received a B.A. from Bowdoin College in 1983 and an M.S.C.S. from Stanford University in 1988. Upon information and belief, Hastings is a citizen of the State of California.

13.  Defendant Leslie Kilgore ("Kilgore") served as the Company's Chief Marketing Officer (formerly Vice President of Marketing) from March 2000 to January 21, 2012. On January 21, 2012, Netflix announced that Ms. Kilgore would be stepping down as Chief Marketing Officer and would join Netflix's Board of Directors as a non-executive Director. From February 1999 to March 2000, Kilgore served as Director of Marketing for Amazon.com, Inc., an Internet retailer. Kilgore served as a brand manager for The Procter & Gamble Company, a manufacturer and marketer of consumer products, from August 1992 to February 1999. Kilgore currently serves on the Board of Directors of Linkedin Corporation along with defendant Battle (see below). She holds an M.B.A. from the Stanford University Graduate School of Business and a B.S. from The

4

1  Wharton School of Business at the University of Pennsylvania. Upon information and belief,
2  Kilgore is a citizen of the State of California.

3      14. Defendant David Wells ("Wells") has served as the Company's Chief Financial
4  Officer since December 2010 and its Vice President of Financial Planning & Analysis from
5  August 2008 to December 2010. He held the position of Director of Operations Planning &
6  Analysis from March 2004 to August 2008. Prior to joining Netflix, Wells served in various roles
7  at Deloitte Consulting from August 1998 to August 2004. Wells holds an M.B.A and M.P.P. from
8  The University of Chicago and an undergraduate degree in both Accounting and English from the
9  University of Virginia. Upon information and belief, Wells is a citizen of the State of California.

10      15. Defendant Neil Hunt ("Hunt") has served as the Company's Chief Product Officer
11  since 2002 and as its Vice President of Internet Engineering from 1999 to 2002. From 1997 to
12  1999, Hunt was Director of Engineering for Rational Software. Hunt holds a doctorate in
13  computer science from the University of Aberdeen, U.K. and a bachelor's degree from the
14  University of Durham, U.K. Upon information and belief, Hunt is a citizen of the State of
15  California.

16      16. Defendant David Hyman ("Hyman") has served as the Company's General Counsel
17  since 2002. Hyman also serves as the Company's secretary. Prior to joining Netflix, Hyman
18  served as General Counsel of Webvan, Inc., an Internet-based grocery delivery service. He holds a
19  J.D. and a B.A. degree from the University of Virginia. Upon information and belief, Hyman is a
20  citizen of the State of California.

21      17. Defendant Patty McCord ("McCord") has served as the Company's Chief Talent
22  Officer since 1998. Prior to joining Netflix, from 1994 to 1997, McCord served as Director of
23  Human Resources at Pure Atria, which was acquired by Rational Software, where she managed all
24  human resources functions and directed all management development programs. Upon
25  information and belief, McCord is a citizen of the State of California.

26
27
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

18. Defendant Ted Sarandos ("Sarandos") has served as the Company's Chief Content Officer and Vice President of Content since 2000. Prior to joining Netflix, Sarandos was Vice President of Product and Merchandising for Video City. Upon information and belief, Sarandos is a citizen of the State of California.

19. Defendant Richard Barton ("Barton") has served as one of the Company's directors since May 2002. In late 2004, Barton co-founded Zillow, Inc. where he is now Executive Chairman of the Board. Additionally, Barton is a Venture Partner with Benchmark Capital. Previously, Barton founded Expedia, Inc. in 1994 and was its President, Chief Executive Officer and director from November 1999 to March 2003. Barton was a director of InterActiveCorp from February 2003 until January 2005. Barton also serves as a director for Avvo, Inc. and Glassdoor.com. Barton holds a B.S. in industrial engineering from Stanford University. Upon information and belief, Barton is a citizen of the State of Washington.

20. Defendant A. George (Skip) Battle ("Battle") has served as one of the Company's directors since June 2005. Battle was previously Executive Chairman of the Board of Ask Jeeves, Inc. which was acquired by IAC/InterActiveCorp in July 2005. He was Chief Executive Officer of Ask Jeeves from 2000 to 2003. From 1968 until his retirement in 1995, Battle served in management roles at Arthur Andersen LLP and then Andersen Consulting LLP (now Accenture), where he became worldwide managing partner of market development and a member of the firm's executive committee. Educated at Dartmouth College and the Stanford Graduate School of Business, Battle currently serves as Chairman of the Board of Fair Isaac Corporation and as a director of Advent Software, Inc., Linkedin Corporation, OpenTable, Inc., Expedia, Inc., and also serves as a board member of the Masters Select family of mutual funds. He was previously a director of PeopleSoft, Inc. Upon information and belief, Battle is a citizen of the State of California.

21. Defendant Charles Giancarlo ("Giancarlo") has served as one of the Company's Directors since April 2007. He is also chairman of the board of directors of Avaya, a leading

6

1 enterprise communications systems company, and serves as a director on the boards of Accenture

2 and Skype. Giancarlo also is a Managing Director at Silver Lake, a private equity firm, where he

3 has served since December 2007. Previously, Giancarlo held a variety of roles at Cisco Systems,

4 Inc., a provider of Internet Protocol (IP)-based networking and other products related to the

5 communications and information technology industry from 1994 through 2007. Most recently, he

6 was President of Cisco-Linksys, LLC, a position he held since June 2004 and Cisco's Executive

7 Vice President and Chief Development Officer, a position he held since July 2005. From July

8 2004 to July 2005, he was Chief Technology Officer. Prior to that, Giancarlo was Senior Vice

9 President and General Manager of Product Development, from July 2001 to July 2004. He also

10 served as Senior Vice President and General Manager of the Commercial Business Segment from

11 May 1999 to July 2001, managing one of Cisco's fastest growing business segments. In May

12 1997, he was appointed to establish Cisco's Global Alliances and ran the division as Senior Vice

13 President until May 1999. In his first Cisco role after joining the company through the acquisition

14 of Kalpana, Inc., Giancarlo held the title of Vice President of Business Development, from

15 December 1994 to May 1997. Giancarlo holds B.S. and M.S. degrees in electrical engineering

16 from Brown University and the University of California at Berkeley, respectively, and an MBA

17 from Harvard University. Upon information and belief, Giancarlo is a citizen of the State of

18 California.

19      22.    Defendant Timothy Haley ("Haley") has served as one of the Company's directors

20 since June 1998. Haley is a co-founder of Redpoint Ventures, a venture capital firm, and has been

21 a Managing Director of that firm since October 1999. Haley has been a Managing Director of

22 Institutional Venture Partners, a venture capital firm, since February 1998. From June 1986 to

23 February 1998, Haley was the President of Haley Associates, an executive recruiting firm in the

24 high technology industry. Haley currently serves on the board of directors of several private

25 companies. Haley holds a B.A. from Santa Clara University. Upon information and belief, Haley

26 is a citizen of the State of California.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

23.  Defendant Jay Hoag ("Hoag") has served as one of the Company's directors since June 1999.  Since June 1995, Hoag has served as a founding General Partner at Technology Crossover Ventures, a private equity and venture capital firm.  Hoag serves on the board of directors of Tech Target and several private companies.  Previously Hoag served on the boards of directors of TheStreet.com, Altiris, Inc. and eLoyalty Corporation.  Hoag holds an M.B.A. from the University of Michigan and a B.A. from Northwestern University.  Upon information and belief, Hoag is a citizen of the State of California.

24.  Defendant Ann Mather ("Mather") has served as one of the Company's directors since July 2010.  Since September 2005, Mather has been a director of Glu Mobile Inc., a publisher of mobile games, and serves as chair of its audit committee.  Since November 2005, Mather has been a director of Google, Inc. and serves as chair of its audit committee.  Since May 2010, Mather has been a director of MoneyGram International, a global payment services company, and serves as chair of its audit committee.  Mather is also a director of Ariat International, Inc, a privately held manufacturer of footwear for equestrian athletes.  Mather was previously a director of Central European Media Enterprises Group, a developer and operator of national commercial television channels and stations in Central and Eastern Europe, Zappos.com, Inc., a privately held, online retailer, until it was acquired by Amazon.com, Inc. in 2009, and Shopping.com, Inc., a price comparison web site, until it was acquired by eBay Inc. in 2005.  Mather was chair of Shopping.com's audit committee, and a member of its corporate governance and nominating committee.  From 1999 to 2004, Mather was Executive Vice President and Chief Financial Officer of Pixar, a computer animation studio.  Prior to her service at Pixar, Mather was Executive Vice President and Chief Financial Officer at Village Roadshow Pictures, the film production division of Village Roadshow Limited.  From 1993 to 1999, she held various executive positions at The Walt Disney Company, including Senior Vice President of Finance and Administration for its Buena Vista International Theatrical Division.  Mather holds a Master of

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Arts degree from Cambridge University.  Upon information and belief, Mather is a citizen of the

2  State of California.

3      25.   The defendants identified in ¶ 12 and ¶¶19-24 are referred to as the "Director

4  Defendants."  Collectively, the defendants named in ¶¶ 12-24 are referred to as the "Individual

5  Defendants."

6              <u>**THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**</u>

7      26.   By reason of their positions as officers and/or directors and fiduciaries of Netflix and

8  because of their ability to control the business and corporate affairs of the Company, the Individual

9  Defendants owed to Netflix and its shareholders fiduciary obligations of trust, loyalty, good faith,

10  and due care, and were and are required to use their utmost ability to control and manage Netflix in

11  a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act

12  in furtherance of the best interests of Netflix and its shareholders so as to benefit all shareholders

13  equally and not in furtherance of their personal interest or benefit.  The conduct of the Individual

14  Defendants complained of herein involves a knowing and culpable violation of their obligations as

15  directors and officers of Netflix, the absence of good faith on their part, and a reckless disregard

16  for their duties to the Company and its shareholders that the Individual Defendants were aware or

17  should have been aware posed a risk of serious injury to the Company.

18      27.   To discharge their fiduciary duties, the officers and directors of Netflix were required

19  to exercise reasonable and prudent supervision over the management, policies, practices and

20  controls of the Company.  By virtue of such duties, the officers and directors of Netflix were

21  required to, among other things:

22          a.   Manage, conduct, supervise and direct the business affairs of Netflix in

23               accordance with all applicable laws, including federal and state laws and

24               regulations, and the policies of the Company;

25          b.   Neither violate, nor permit any officer, director or employee of Netflix to

26               violate applicable laws, rules, and regulations;

27

9

28

c.   Remain informed as to the status of Netflix's operations, including its internal audit capabilities and the financial reporting requirements under the federal securities laws, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices; and

d.   Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

28.   Moreover, the Board has adopted a Code of Ethics (the "Code") for its directors, officers and other employees.   According to Netflix, the Code has been reasonably designed to deter wrongdoing and to promote:

a.   Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

b.   Full, fair, accurate, timely, and understandable disclosure in reports and documents that a registrant files with, or submits to, the Securities and Exchange Commission and in other public communications made by the Company;

c.   Compliance with applicable governmental laws, rules and regulations;

d.   The prompt internal reporting to an appropriate person or persons identified in the Code of violations of the Code; and

e.   Accountability for adherence to this Code.

29.   Under the heading of "Honest and Ethical Conduct" the Code states:

Netflix Parties are expected to act and perform their duties ethically and honestly and with the utmost integrity.   Honest conduct is considered to be conduct that is free from fraud or deception. Ethical conduct is considered to be conduct conforming to accepted professional

10

standards of conduct.  Ethical conduct includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships as discussed in below.

30.  The Code then goes on to state:

A conflict of interest exists where the interests or benefits of one person or entity conflict or appear to conflict with the interests or benefits of the Company.  While it is not possible to describe every situation in which a conflict of interest may arise, Netflix Parties must never use or attempt to use their position with the Company to obtain improper personal benefits.  Any Netflix Party who is aware of a conflict of interest, or is concerned that a conflict might develop, is required to discuss the matter with a higher level of management or the General Counsel promptly.  Senior Financial Officers may, in addition to speaking with the General Counsel, also discuss the matter with the Audit Committee.

31.  On the topic of disclosures, the Code states:

Senior Financial Officers are responsible for ensuring that the disclosure in the Company's periodic reports is full, fair, accurate, timely and understandable.  In doing so, Senior Financial Officers shall take such action as is reasonably appropriate to (i) establish and comply with disclosure controls and procedures and accounting and financial controls that are designed to ensure that material information relating to the Company is made known to them; (ii) confirm that the Company's periodic reports comply with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and (iii) ensure that information contained in the Company's periodic reports fairly presents in all material respects the financial condition and results of operations of the Company.

Senior Financial Officers will not knowingly (i) make, or permit or direct another to make, materially false or misleading entries in the Company's, or any of its subsidiary's, financial statements or records; (ii) fail to correct materially false and misleading financial statements or records; (iii) sign, or permit another to sign, a document containing materially false and misleading information; or (iv) falsely respond, or fail to respond, to specific inquiries of the Company's independent auditor or outside legal counsel.

32.  The practices outlined in the Code are especially true for the Company's Audit Committee members, defendants Giancarlo, Haley, and Mather.  As noted in the Company's Audit Committee Charter, the purpose of the Audit Committee, among other things, shall be:

a.  to provide oversight and monitoring of (i) the Company's financial reporting process (ii) the Company's systems of internal controls over financial reporting, (iii) the integrity of the Company's financial statements, and (iv) the independent auditors' qualifications, independence and performance;

11

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

b.      to provide the Board with the results of its monitoring and recommendations derived therefrom;

c.      to assist the Board in ensuring the Company's compliance with legal and regulatory requirements in connection with the Company's financial reporting process; and

d.      to provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

33.     Further, the Audit Committee's Charter delineates the following duties and responsibilities, among others:

1.      Providing oversight and monitoring of the activities of Company management, including without limitation, the chief financial officer and principal accounting officer and controller, and the independent auditors with respect to the Company's financial reporting and compliance process;

2.      Reviewing on a continuing basis the adequacy and effectiveness of the Company's system of internal controls over financial reporting as well as the Company's disclosure controls and procedures;

3.      Reviewing, in conjunction with legal counsel, any legal matters that could have a significant impact on the Company's financial statements;

4.      Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls, auditing matters or fraudulent financial reporting and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting internal controls or auditing matters;

12

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

5.   Providing oversight and review of the Company's asset management policies, including without limitation an annual review of the Company's investment policies and performance for cash and short-term investments; and

6.   Reviewing and approving related party transactions for potential conflicts of interests.

34.   The Individual Defendants, because of their positions of control and authority as officers, directors and/or members of the Audit Committee were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their executive, managerial and/or directorial positions with Netflix, each of the Individual Defendants had access to adverse, non-public information concerning the financial condition, financial results, and operations of Netflix, and with this inside information, directed Netflix to wastefully buyback large amounts of Netflix stock at overly inflated prices in order to increase the share price of Netflix for the benefit of the Individual Defendants who were actively selling their Netflix shares during the same time period.   Moreover, the Individual Defendants undertook and continued this misguided strategy in the face of increasing subscription costs, increasing costs for premium content, the likely loss of one of its main premium content providers and overall shareholder outrage regarding the direction of the Company.

## NETFLIX COMPENSATION STRATEGY

35.   As outlined in the Company's Proxy Statement, filed on April 20, 2011, individual compensation is linked to Company performance by virtue of the stock options granted by the Company.

36.   To that end, total compensation is expressed in a dollar-denominated amount, but may be allocated between the two primary elements of the Company's compensation program: salary and stock options.

37.   According to the April 20, 2011 Proxy Statement, after determining the total compensation amount for each named executive officer, which includes defendants Hastings,

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Hunt, Kilgore, Wells, and Sarandos, the total compensation amount for each individual is divided into the two key elements including both salary and stock options. This allocation is made pursuant to the compensation preferences of each named executive officer who, within the parameters of the total compensation, can request a customized combination of salary and stock options. It is fair to say that stock options are, and have been one of the favored, if not the key, compensation methods used by Netflix.

38.  Moreover, the Board has traditionally received the entirety of its director fees in the form of stock options, and the Board and management believe that stock options are important to recruiting and retaining high performing employees.

## FACTUAL ALLEGATIONS

39.  Netflix is a provider of on-demand internet streaming media in the United States, Canada, and Latin America and flat rate DVD-by-mail in the United States. The Company was established in 1997 and started its subscription-based digital distribution service in 1999.

40.  Netflix conducted an initial public offering on May 29, 2002, selling 5,500,000 shares of common stock at the price of $15.00 per share. On June 14, 2002, the Company sold an additional 825,000 shares of common stock at the same price. After incurring substantial losses during its first few years, Netflix posted its first profit during fiscal year 2003, earning $6.5 million profit on revenues of $272 million.

41.  By 2009, Netflix was offering a collection of 100,000 titles on DVD and had surpassed 10 million subscribers.

42.  Netflix has been one of the most successful dot-com ventures to date. The Company's published subscriber count increased from one million in the fourth quarter of 2002 to around 5.6 million at the end of the third quarter of 2006, to 23.6 million in April 2011. Netflix now also operates an online affiliate program which has helped it to build online sales for DVD rentals.

14

43. In addition, Netflix offers Internet video streaming ("Watch Instantly") of selected titles to computers running Windows or Mac OS X and to compatible devices. Internet video streaming once came at no additional charge with Netflix's regular subscription service. However, only a small portion of Netflix's content is available *via* the "Watch Instantly" option. In its simplest form, video is streamed to the user using standard PC hardware, and Microsoft's Silverlight software. Viewing is initiated by pressing a "Play Instantly" button, and played back on the PC monitor. According to a 2011 report by Sandvine, Netflix is the biggest source of North American web traffic, accounting for 24.71 percent of aggregated traffic.

44. Initially, the feature offered subscribers one hour of media for approximately every dollar they spent on their subscription. In January 2008, however, Netflix lifted this restriction. Virtually all subscribers became entitled to unlimited hours of streaming media at no additional cost.

45. On October 1, 2008, Netflix announced a partnership with Starz to bring over 2,500 new movies and television shows to Watch Instantly in what is called Starz Play. Since that time, Netflix has continued to grow its ability to stream movies, but Starz Play has continued to be its most important provider of premium content for video streaming.

46. However, even with expanded sources of content, the Individual Defendants were aware that the Company's rapid growth was in jeopardy. In 2011, the Company stopped providing as extensive of guidance as it had previously, limiting subscription and revenue projections to the following quarter rather than the full year. Netflix then announced an increase to the cost of services shortly after the second quarter ended, a move which predictably led to the defection of hundreds of thousands of subscribers. Finally, negotiations for the renewal of Netflix's contract with Starz broke down, as the Individual Defendants knew they would, given the price increase being sought by Starz.

47. This was noted in the Huffington Post on September 1, 2011, which stated in pertinent part: "[A]pparently, the money just isn't there, and it sounds like Starz is interested in

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  seeing other people.  Netflix paid $30 million back in October 2008 to gain the rights to stream

2  Starz films, and many analysts called the deal a steal for Netflix."  *See*

3  http://www.huffingtonpost.com/2011/09/01/starz-netflix-contract_n_945715.html.

4      48.  This was, however, not a surprise to defendant Hastings given that in December of

5  2010 he personally responded to an online blog post and stated in part:

> Moving on to the widely-discussed issue of increased content costs,
> it is true that we are paying more for any given piece of content than
> we were two years ago, and that in two years, we'll pay more than
> we pay today.  Part of our goal as a business is to make money for
> content producers and to become one of their largest and best
> revenue sources.  *Fortunately, our subscriber base is growing fast
> enough, and DVD shipments are growing slow enough, that we
> can afford to pay for the existing streaming content we have, and
> also get more content.*  We try not to comment on specific deals, like
> the Starz renewal, as that rarely helps us get deals done.

> Investors sometimes see the content cost threat as an issue around
> our margins.  But we have no intention of overspending relative to
> our margin structure, and there is no specific content that we "must
> have" at nearly any cost.  In our domestic business we spend 65-70%
> of revenue on COGS (which is mostly content and postage).  So if
> content costs rose faster than we expected, then in practice we'd
> have less content than otherwise, rather than less margin.  This
> would ultimately show up in less subscriber growth than we wanted
> from a not-as-good-as-it-would-otherwise-be service; it would not
> likely show up as a sudden hit to margins.  Management at Netflix
> largely controls margins, but not growth.

> Turning to competition, there is a legitimate short thesis in the
> unknown of who enters directly against us and when.  Some
> offerings like Hulu Plus have some content we do not, but we are
> making progress on the gap.  In the near term, some of our
> subscribers will also subscribe to Hulu Plus, but very few will quit
> Netflix because we have lots of streaming content that Hulu Plus
> does not.  For a competitive firm to materially hurt our growth, they
> have to have some positive differentiator (price, additional content,
> integration, etc.), and then they have to market their service
> effectively.  This wild-card of major new competitor offering great
> content and marketing aggressively is the single best near-term short
> thesis, but no one knows if it will happen in 2011.....

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  *See* http://seekingalpha.com/article/242653-netflix-ceo-reed-hastings-responds-to-whitney-

2  tilson-cover-your-short-position-now.

3      49.  Following this unusual announcement by Netflix's CEO, the stock price of Netflix

4  jumped 4% in one day, or $8.19 per share to close at $186.24 per share on December 21, 2010.

5      50.  On July 12, 2011, Netflix announced that it would separate the current subscription

6  plans into two separate plans (effective September 1, 2011 for existing subscribers): one covering

7  the instant streaming and the other covering DVD rental. The cost for streaming would be $7.99

8  monthly while DVD rental would start at the same price. The changes cut prices slightly for

9  customers who only wanted to rent DVDs, but streaming video would now cost extra. Customers

10  who wanted both options would essentially have to pay for two separate rental packages, raising

11  their overall bill. *See* http://money.cnn.com/2011/ 07/12/technology/netflix_unlimited_dvd

12  /index.htm.

13      51.  Netflix's customers had paid $9.99 a month for a plan that offered unlimited

14  streaming plus one (1) DVD at a time. Under the new plan, an unlimited streaming-only plan

15  remained at $7.99 a month, while its "1 DVD at a time" plan would also cost $7.99. That means

16  customers who want both streaming and DVDs will have to spend at least $15.98 a month instead

17  of $9.99. *Id.*

18      52.  The announcement led to a flurry of negative reaction amongst Netflix's Facebook

19  followers, who proceeded to post negative comments on the Company's wall. Twitter comments

20  also spiked with a "Dear Netflix" trend that included generally negative comments as well. The

21  Company defended its decision during its initial announcement of the change. "Given the long life

22  we think DVDs by mail will have, treating DVDs as a $2 add-on to our unlimited streaming plan

23  neither makes great financial sense nor satisfies people who just want DVDs," Netflix wrote on its

24  blog. "Creating an unlimited-DVDs-by-mail plan (no streaming) at our lowest price ever, $7.99,

25  does make sense and will ensure a long life for our DVDs-by-mail offering."

26

27  <center>17</center>

28  <center>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</center>

53.   Regardless of Netflix's position on the issue, this announcement began a steady slide of Netflix's share price as subscribers faced with higher costs began to leave Netflix in favor of other lower cost DVD rental and video streaming providers.

54.   On September 18, 2011, defendant Hastings said in a Netflix blog post that the DVD section of Netflix would be split off and renamed Qwikster, and stated that the only major change would be separate websites for the services.  Netflix subscribers who wanted DVDs by mail would have had to use a separate website to access Qwikster.  Hastings' announcement lead to a further decay of Netflix's share price and continued the reversal of fortunes suffered by the price of Netflix's shares.

55.   Throughout 2010, Netflix's stock price increased 219% to $175.70.  At their peak, in July 2011, Netflix shares were trading for almost $299.  However, following the customer dissatisfaction and resulting loss of subscribers after the announcements by CEO Reed Hastings that streaming and DVD rental would be charged separately, leading to a higher price for customers who wanted both, and that the DVD rental would be split off as the subsidiary Qwikster, the share price fell steeply, to around $130.  The stock continued to slump, losing almost another 50%, before finally beginning to rebound.

56.   On October 24, 2011, Netflix announced it lost 800,000 US subscribers in the third quarter of 2011 with more subscriber losses expected in the fourth quarter of 2011.  *See* http://www.bloomberg.com/news/2011-10-24/netflix-3q-subscriber-losses-worse-thanforecast.html.

57.   On September 1, 2011, just as Netflix's price increase was going into effect, Starz, arguably Netflix's most important streaming content provider announced it will remove their movies from Netflix streaming services on February 28, 2012.  What this means for Netflix subscribers is that they will not have digital access to movies from Sony and Disney.  Netflix shares dropped 9% in after-market trading after the announcement by Starz.

58.   The reality is buying premium content like Starz Play is much more expensive than it was when Netflix entered the original Starz contract.  However, its importance was not lost on

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Netflix, who in its 2010 Annual Shareholder Report stated that "[i]f we are not successful in

2  maintaining existing and creating new relationships, or if we encounter technological, content

3  licensing or other impediments to our streaming content, our ability to grow our business could be

4  adversely impacted."

5      59.   All of this makes Netflix's stock repurchases even more curious. Few fast-growing

6  Silicon Valley companies buy back shares, preferring to hoard whatever cash they generate to fund

7  expansion. Not Netflix. Between the start of 2007 and June 30, 2011, Netflix generated $507

8  million in free cash flow. Yet, over that same period, as the Company's stock soared, it spent $994

9  million buying back shares.

10      60.   The Company paid an average of $238 in the second quarter of this year and $218 in

11  the third quarter to purchase its own shares. The stock has since plummeted to under $64 a share,

12  before beginning to rebound because of an upswing in the market.

13      61.   To help cover the cash gap caused by these buy backs, Netflix issued $200 million in

14  bonds, on which it is paying 8.5% interest. As a result, it finished June 30, 2011 with $176 million

15  in net cash and short-term investments, down from $400 million at the end of 2006.

16      62.   All of these activities were undertaken in the face of escalating costs for the purchase

17  of content for Netflix's streaming services, the likely loss of the ability to stream movies from

18  Starz, the Company's top premium content provider, and an increase in subscription prices, all

19  known events to the Board. *See* http://netcompetitionblog.org/tag/ competition/page/3/.

20      63.   Moreover, it was recently announced that Verizon is partnering with Coinstar in a

21  move that will provide even stiffer competition for Netflix when it comes to video streaming. *See*

22  http://finance.yahoo.com/news/Coinstar-Verizon-Double-Team-wscheats-782345703.html?x=0.

23  This is in addition to already increased competition from the likes of Amazon and Hulu Plus. *See*

24  http://gigaom.com/video/amazon-prime-viacom-deal/.

25      64.   What makes Netflix's stock repurchase program even more curious is that stock

26  repurchase programs are usually undertaken by mature companies where management feels that

27

28  VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 the stock is underpriced, which is a situation in no way congruous with Netflix's circumstances.

2 At the time of Netflix's buybacks, the share price of Netflix was already trading at near historic

3 highs.

4     65.   What did Netflix gain from the repurchases of its stock at such elevated prices?

5 When a company announces a buyback it is usually perceived by the market as a positive

6 occurrence, which often causes the share price to rise rapidly. This is what continued to happen to

7 Netflix's share price, to the overall financial benefit of the Individual Defendants. By helping fuel

8 Netflix's stock rally, the Individual Defendants made employee stock options, of which they were

9 by far the largest holders, more valuable. Defendant Hastings, for instance, has been a steady

10 seller through a prearranged trading program, exercising options as low as $1.50 for as much as

11 $299.50 a share.

12     66.   As shown in the charts below, Hastings and the rest of the Individual Defendants

13 prospered from their ability to exercise stock options and then sell the shares at Netflix's inflated

14 stock price:

**RICHARD BARTON**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|------|-------------|------------|----------|-------|
| 07/27/11 | Exercise | 9,620 | $21.73 | $208,994.50 |
| 07/27/11 | Sold | 9,620 | $271.68 | $2.61 Mil |

**A. GEORGE BATTLE**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|------|-------------|------------|----------|-------|
| 07/11/11 | Sold | 1,500 | $300.00 | $450,000.00 |
| 07/11/11 | Exercise | 1,000 | $28.87 | $28,865.00 |
| 06/03/11 | Sold | 1,500 | $275.00 | $412,500.00 |
| 06/03/11 | Exercise | 1,000 | $28.13 | $28,130.00 |
| 05/24/11 | Sold | 1,500 | $250.00 | $375,000.00 |
| 05/24/11 | Exercise | 1,000 | $27.49 | $27,490.00 |
| 04/28/11 | Sold | 3,000 | $235.13 | $705,390.00 |
| 04/28/11 | Exercise | 2,000 | $26.98 | $53,960.00 |

20

| 04/28/11 | Sold | 3,000 | $235.65 | $706,935.00 |
| 04/28/11 | Exercise | 2,000 | $26.98 | $53,960.00 |

**CHARLES GIANCARLO**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|---|---|---|---|---|
| 09/01/11 | Sold | 2,514 | $234.53 | $589,608.44 |
| 09/01/11 | Exercise | 1,681 | $23.78 | $39,974.18 |
| 08/01/11 | Exercise | 1,712 | $23.36 | $39,992.32 |
| 08/01/11 | Sold | 2,545 | $268.52 | $683,383.38 |
| 07/01/11 | Exercise | 1,805 | $22.15 | $39,980.75 |
| 07/01/11 | Sold | 2,638 | $262.06 | $691,314.25 |
| 06/01/11 | Sold | 2,648 | $269.23 | $712,921.06 |
| 06/01/11 | Exercise | 1,815 | $22.04 | $40,002.60 |
| 05/02/11 | Sold | 2,688 | $238.22 | $640,335.38 |
| 05/02/11 | Exercise | 1,855 | $21.57 | $40,012.35 |
| 04/01/11 | Sold | 2,717 | $241.00 | $654,797.00 |
| 04/01/11 | Exercise | 1,883 | $21.22 | $39,957.26 |
| 03/01/11 | Sold | 2,887 | $206.22 | $595,357.13 |
| 03/01/11 | Exercise | 2,053 | $19.48 | $39,992.44 |
| 02/01/11 | Exercise | 2,203 | $18.14 | $39,962.42 |
| 02/01/11 | Sold | 3,037 | $214.84 | $652,469.06 |
| 01/19/11 | Sold | 3,165 | $192.81 | $610,243.63 |
| 01/19/11 | Exercise | 2,331 | $17.16 | $39,999.96 |

**TIMOTHY HALEY**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|---|---|---|---|---|
| 01/28/11 | Sold | 20,398 | $211.28 | $4.31 Mil |
| 01/28/11 | Exercise | 20,398 | $23.31 | $475,477.38 |

**REED HASTINGS**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|---|---|---|---|---|
| 10/06/11 | Sold | 5,000 | $119.70 | $598,500.00 |
| 10/06/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 09/29/11 | Sold | 5,000 | $128.13 | $640,650.00 |
| 09/29/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 09/22/11 | Sold | 5,000 | $132.13 | $660,650.00 |

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| 09/22/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 09/15/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 09/15/11 | Sold | 5,000 | $177.00 | $885,000.00 |
| 09/08/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 09/08/11 | Sold | 5,000 | $214.06 | $1.07 Mil |
| 09/01/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 09/01/11 | Sold | 5,000 | $234.53 | $1.17 Mil |
| 08/25/11 | Sold | 5,000 | $217.79 | $1.09 Mil |
| 08/25/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 08/18/11 | Sold | 5,000 | $224.13 | $1.12 Mil |
| 08/18/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 08/11/11 | Sold | 5,000 | $235.11 | $1.18 Mil |
| 08/11/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 08/04/11 | Sold | 5,000 | $257.05 | $1.29 Mil |
| 08/04/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 07/28/11 | Sold | 5,000 | $264.54 | $1.32 Mil |
| 07/28/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 07/21/11 | Sold | 5,000 | $281.80 | $1.41 Mil |
| 07/21/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 07/14/11 | Sold | 5,000 | $299.50 | $1.50 Mil |
| 07/14/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 07/07/11 | Sold | 5,000 | $293.20 | $1.47 Mil |
| 07/07/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 06/30/11 | Sold | 5,000 | $264.61 | $1.32 Mil |
| 06/30/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 06/23/11 | Sold | 5,000 | $245.00 | $1.23 Mil |
| 06/23/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 06/16/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 06/16/11 | Sold | 5,000 | $256.45 | $1.28 Mil |
| 06/09/11 | Sold | 5,000 | $262.22 | $1.31 Mil |
| 06/09/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 06/02/11 | Sold | 5,000 | $266.03 | $1.33 Mil |
| 06/02/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 05/26/11 | Sold | 5,000 | $258.75 | $1.29 Mil |
| 05/26/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 05/19/11 | Sold | 5,000 | $243.00 | $1.22 Mil |
| 05/19/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 05/12/11 | Sold | 5,000 | $241.21 | $1.21 Mil |
| 05/12/11 | Exercise | 5,000 | $1.50 | $7,500.00 |

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 05/05/11 | Sold | 5,000 | $226.43 | $1.13 Mil |
| 05/05/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 04/28/11 | Sold | 5,000 | $233.00 | $1.17 Mil |
| 04/28/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 04/21/11 | Sold | 5,000 | $244.12 | $1.22 Mil |
| 04/21/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 04/14/11 | Sold | 5,000 | $237.72 | $1.19 Mil |
| 04/14/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 04/07/11 | Sold | 5,000 | $235.38 | $1.18 Mil |
| 04/07/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 03/31/11 | Sold | 5,000 | $237.28 | $1.19 Mil |
| 03/31/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 03/24/11 | Sold | 5,000 | $231.98 | $1.16 Mil |
| 03/24/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 03/17/11 | Sold | 5,000 | $216.94 | $1.08 Mil |
| 03/17/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 03/10/11 | Sold | 5,000 | $191.08 | $955,400.00 |
| 03/10/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 03/03/11 | Sold | 5,000 | $206.43 | $1.03 Mil |
| 03/03/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 02/24/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 02/24/11 | Sold | 5,000 | $212.50 | $1.06 Mil |
| 02/17/11 | Sold | 5,000 | $235.87 | $1.18 Mil |
| 02/17/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 02/10/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 02/10/11 | Sold | 5,000 | $220.97 | $1.10 Mil |
| 02/03/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 02/03/11 | Sold | 5,000 | $211.05 | $1.06 Mil |
| 01/27/11 | Sold | 5,000 | $207.11 | $1.04 Mil |
| 01/27/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 01/20/11 | Exercise | 5,000 | $1.50 | $7,500.00 |
| 01/20/11 | Sold | 5,000 | $186.72 | $933,600.00 |

| JAY HOAG | | | | |
| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
| 07/28/11 | Sold | 4,510 | $267.81 | $1.21 Mil |
| 07/28/11 | Exercise | 4,510 | $184.57 | $832,410.69 |
| 05/05/11 | Sold | 10,112 | $231.62 | $2.34 Mil |

23

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 05/05/11 | Exercise | 10,112 | $57.97 | $586,192.63 |
| 02/02/11 | Sold | 9,500 | $211.06 | $2.01 Mil |
| 02/02/11 | Exercise | 9,500 | $35.73 | $339,435.00 |

**NEIL HUNT**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
| --- | --- | --- | --- | --- |
| 09/01/11 | Sold | 1,589 | $234.53 | $372,668.16 |
| 09/01/11 | Exercise | 1,589 | $55.58 | $88,316.62 |
| 08/01/11 | Sold | 3,000 | $268.52 | $805,560.00 |
| 08/01/11 | Exercise | 3,000 | $55.58 | $166,740.00 |
| 07/01/11 | Sold | 3,000 | $262.06 | $786,180.00 |
| 07/01/11 | Exercise | 3,000 | $54.40 | $163,185.00 |
| 06/01/11 | Exercise | 5,000 | $51.74 | $258,725.00 |
| 06/01/11 | Sold | 5,000 | $269.23 | $1.35 Mil |
| 05/02/11 | Sold | 5,000 | $238.22 | $1.19 Mil |
| 05/02/11 | Exercise | 5,000 | $35.60 | $178,000.00 |
| 04/29/11 | Exercise | 2,000 | $1.50 | $3,000.00 |
| 04/01/11 | Sold | 5,000 | $241.00 | $1.21 Mil |
| 04/01/11 | Exercise | 5,000 | $31.26 | $156,325.00 |
| 03/01/11 | Sold | 5,000 | $206.22 | $1.03 Mil |
| 03/01/11 | Exercise | 5,000 | $27.65 | $138,250.00 |
| 02/01/11 | Sold | 4,000 | $214.84 | $859,360.00 |
| 02/01/11 | Exercise | 4,000 | $49.05 | $196,200.00 |
| 01/03/11 | Sold | 4,000 | $178.67 | $714,680.00 |
| 01/03/11 | Exercise | 4,000 | $43.38 | $173,540.00 |

**DAVID HYMAN**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
| --- | --- | --- | --- | --- |
| 06/03/11 | Sold | 4,760 | $275.00 | $1.31 Mil |
| 06/03/11 | Exercise | 4,760 | $31.90 | $151,820.20 |
| 05/24/11 | Sold | 4,760 | $250.00 | $1.19 Mil |
| 05/24/11 | Exercise | 4,760 | $27.29 | $129,900.40 |

**LESLIE KILGORE**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
| --- | --- | --- | --- | --- |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 10/26/11 | Exercise | 2,028 | $1.50 | $3,042.00 |
| 07/25/11 | Sold | 566 | $280.57 | $158,802.63 |
| 05/02/11 | Sold | 29,011 | $238.22 | $6.91 Mil |
| 05/02/11 | Exercise | 29,011 | $64.24 | $1.86 Mil |
| 12/30/10 | Exercise | 3,000 | $1.50 | $4,500.00 |

**PATTY MCCORD**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|---|---|---|---|---|
| 07/11/11 | Sold | 1,504 | $300.00 | $451,200.00 |
| 07/11/11 | Exercise | 1,504 | $166.54 | $250,468.64 |
| 05/24/11 | Sold | 1,436 | $250.00 | $359,000.00 |
| 05/24/11 | Exercise | 1,436 | $118.39 | $170,015.22 |

**TED SARANDOS**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|---|---|---|---|---|
| 08/08/11 | Sold | 7,410 | $229.98 | $1.70 Mil |
| 08/08/11 | Exercise | 7,410 | $49.42 | $366,239.25 |
| 04/27/11 | Sold | 17,950 | $228.67 | $4.10 Mil |
| 04/27/11 | Exercise | 17,950 | $33.49 | $601,235.25 |

**DAVID WELLS**

| DATE | TRANSACTION | NUM SHARES | PRICE(S) | VALUE |
|---|---|---|---|---|
| 07/05/11 | Sold | 1,286 | $279.99 | $360,067.13 |
| 07/05/11 | Exercise | 1,286 | $151.01 | $194,198.86 |
| 05/24/11 | Sold | 1,646 | $249.99 | $411,483.53 |
| 05/24/11 | Exercise | 1,646 | $84.16 | $138,527.36 |
| 05/02/11 | Sold | 3,264 | $238.22 | $777,550.06 |
| 05/02/11 | Exercise | 3,226 | $36.37 | $117,313.49 |

## DEFENDANTS ISSUE FALSE AND MISLEADING STATEMENTS
## REGARDING NETFLIX'S ABILITY TO ACQUIRE CONTENT

67.   On January 26, 2011, Netflix issued a press release announcing its fourth quarter and year-end financial results for the period ended December 31, 2010.  The Company reported net income of $47 million, or $0.87 diluted earnings per share ("EPS") for the fourth quarter of 2010.

The Company reported 20 million subscribers and net subscriber additions of 3.08 million for its fourth quarter 2010, and a growth of 7.7 million net subscriber additions for 2010, up from its forecast at the start of 2010 of net additions of 3.6 million. Regarding the Company's business outlook, the release stated in part:

**Business Outlook**

Going forward we are providing more detail in our guidance for the current quarter by breaking out domestic versus international and by providing operating income guidance. Our business is so dynamic that we will be doing less calendar year guidance than in the past.

Our domestic guidance for Q1 2011 is:

- Subscribers between 21.9 million and 22.8 million

- Revenue between $684 million and $704 million

- Operating Income between $98 million and $116 million

$$*\qquad *\qquad *$$

Our global guidance for Q1 2011 is:

- Net Income between $49 million and $62 million

- EPS between $0.90 and $1.13

For the year 2011:

- We expect to operate domestically at approximately a 14% operating margin

- We expect domestic subscriber net additions to continue to grow in 2011

- We expect our Canadian operations to have a positive operating margin in Q3

- We expect to have approximately $50 million in operating losses in international in 2H of 2011 as we expand beyond Canada

68. The release also stated in part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In November last year we introduced our $7.99 per month pure streaming plan, and we increased the prices on our combination plans, which include streaming and unlimited DVD rentals.  As you can see from our strong Q1 subscriber guidance, our pure streaming plan has a great deal of consumer appeal. More than one third of 14 new subscribers are signing up for the pure streaming plan, and we expect that percentage to grow over time.  The balance of new subscribers primarily takes our $9.99 1-DVD combination plan.  Very few of our existing subscribers are downgrading to the pure streaming plan.

Our three virtuous cycles of subscriber growth are:

1.    More subscribers means more money to license content with, *which drives more subscriber growth*

2.    More subscribers means more word-of-mouth from subscribers to those who are not yet subscribers, *which drives more subscriber growth*

3.    More subscribers means we can increase R&D spending to improve our user experience, *which drives more subscriber growth*

\*               \*               \*

**Streaming Content**

We continue to expand our selection of movies and TV shows available to watch instantly.  Our Epix deal just completed its first full quarter of current studio releases and great catalog movies.  We also closed an expansive new deal with ABC/Disney that includes all previous seasons of "Lost," "Desperate Housewives," and "Brothers and Sisters" from ABC and "Phineas and Ferb," "Good Luck Charlie" and a host of other popular shows and original movies from the Disney Channel.

Our unique direct deals with independent producers and distributors have made it possible for us to bring all five of the just-announced 2011 Academy Awards-nominated Best Documentary Feature films to our growing streaming library.  Two of those films – "Exit Through the Gift Shop" and "Restrepo"- are available to stream now.  "Waste Land" is coming on March 29 and "Gasland" and "Inside Job" will be coming soon through existing deals.

Our interest in television shows is high.  Our primary strategy is to offer complete previous seasons of shows rather than offering those shows the day of, or a few days after, broadcast, during the critical ratings and revenue window.  This is in the best interest of content owners and is consistent with our desire to offer a very low-cost service for consumers.  As with theatrical ticket sales, VOD and the 28-day DVD sale window, this allows studios to capture the market for those most interested in seeing content right away.  You will occasionally see us offering

27

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

shows day after broadcast, as we do with "Saturday Night Live," or 15 days after broadcast, as we do with Disney Channel programs, but it doesn't represent a change in our overall TV strategy.

<p style="text-align:center">*           *           *</p>

**Operating Margins**

Managing to a target operating margin has proven to be effective for us, and we plan to continue to do so. For the next few quarters we will target a domestic operating margin of about 14%, which we believe is a good balance of growth and earnings. The variable costs of DVD shipments, and the seasonal nature of big DVD releases, contributed to material expense seasonality in the past. While this remains true of DVD, this expense seasonality will smooth out as streaming becomes the majority of our content expense. Seasonality of subscriber growth will remain, but the domestic margin structure going forward should be less seasonal than in the past. Occasionally, we will have the opportunity to close a big streaming content deal, and our margins will dip temporarily, *but most of the streaming deals are less lumpy, and we will be able to manage close to the domestic 14% target.* (emphasis added)

69.     After releasing its 2010 fourth quarter and year-end financial results on January 25, 2011, Netflix hosted a conference call with analysts, investors and media representatives, during which defendant Hastings represented the following:

[ANALYST:] Do you believe it will get harder to acquire incremental films and TV shows from major Hollywood studios? And, where are you in quantity today and where would you hope to be in a few years?

[HASTINGS:] Doug, no it's not gotten harder, it's gotten easier as we pay more. Three, four yeas ago, when we couldn't pay much, it was very hard, and, *now because we've got significant dollars to spend, we've got people coming to us and that makes perfect sense.* So, while [sic] *we're feeling great about both our ability to make content owners a lot of money and to get deals done and continue to fill out and improve our selection.* (emphasis added)

70.     On February 18, 2011, Netflix filed its Form 10-K with the SEC for the year ended December 31, 2010, in which it discussed the impact of possible changes with content distributors. The Form 10-K assured investors about Netflix's margins:

We believe that the streaming content we make available to our subscribers is sufficiently diversified, such that we will not be forced to pay licensing fees for content in excess of our desired operational margins. We believe that any failure to secure content will manifest in lower subscriber acquisition and retention and not in materially reduced margins. Nonetheless, given the multiple-year duration and

<p style="text-align:center">28</p>

largely fixed nature of content licenses, if we do not experience subscriber acquisition and retention as forecasted, our margins may be impacted by these fixed content licensing costs.  During the course of our license relationship, various contract administration issues can arise.  To the extent that we are unable to resolve any of these issues in an amicable manner, our relationship with the studios and other content distributors or our access to content may be adversely impacted.

71.   This disclosure concealed the extent of the price increases then being demanded by content providers as alternative streaming venues also competed for content.  This concealment also meant that investors would be misled about Netflix's need for additional cash for content, cash which instead had been improperly allocated to the stock buy back program which benefitted insiders.

72.   On April 25, 2011, Netflix issued a press release announcing its first quarter 2011 financial results.  The Company reported net income of $60 million, or $1.11 diluted EPS, and revenue of $718 million for the quarter ended March 31, 2011.  The Company further reported strong quarterly growth in subscribers of 23.6 million globally.  Additionally, Netflix provided its outlook for the second quarter of 2011, stating in part:

**Business Outlook**

|  | Guidance |
|---|---|
| **Domestic Q2 2011** | |
| Subscribers | 24.0m to 24.8m |
| Revenue | $762m to $778 |
| Operating Income | $100m to $166m |
| **International Q2 2011**: | |
| Subscribers | 900k to 1,050k |
| Revenue | $16m to $20m |
| Operating Loss | -$14m to -$10m |
| Global Q2 2011: | |
| Net Income | $50m to $62m |
| EPS | $0.93 to 1.15 |

73.   The release also stated in part:

**Domestic Streaming Content**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In Q1, we completed several important streaming content deals, bringing in additional first-time partners, extending and expanding relationships with other providers and pioneering some new approaches we believe will help Netflix continue to differentiate itself. The result is that Netflix subscribers can instantly enjoy a wider and better selection of TV shows and movies than ever before.

\*     \*     \*

As streaming grows, TV shows and feature films are being enjoyed in nearly equivalent volume by our subscribers and our content acquisition team is focusing their attention accordingly. We've recently added lots of new TV episodes, and the profile and completeness of the shows continues to improve. As for movies, we've recently added a large number of core catalog titles from Paramount that are exclusive to Netflix against broadcast, cable and other over-the-top services and titles from Lionsgate and MGM that are exclusive against other over-the-top services.

While the size of these deals and their impact on our P&L is often speculated about in the press, spending typically takes place over multiple years and the amortized cost of these deals is taken into consideration in our 14% target operating margin model.

74. After releasing its first quarter 2011 financial results on April 25, 2011, Netflix hosted a conference call with analysts, investors and media representatives. In response to a question about content spending, defendant Hastings stated:

We'll run the US around 14% operating margin and spend on content in accordance with that.

75. On June 1, 2011, defendant Wells spoke at the Bank of America Merrill Lynch Technology Conference. In response to an analyst question about content spending, Wells stated in part:

[ANALYST:] With these seemingly large numbers, how are you able to manage your financial goals when you're adding, and manage to a long-term operating margin even as you add so much new spend in a new area that really, until January, you didn't have a direct product for?

[WELLS:] Well, I'd say that the discipline that we're holding to for this year is to hold to a 14 - around a 14% domestic operating margin target. And the numbers that you see in the press, some accurate, some not, are indicative of the total value of a deal. So if it's a three-year deal or a five-year deal, it's going to be the total value of that deal. It isn't the P&L expense that we would see in any given year or quarter, and so it's going to be a fraction of that. And so to the extent that

we're holding to a content budget, the deals that we're making, I can assure you, we are still well within the expectations of our operating margin targets.

76. On July 12, 2011, Netflix announced it had raised prices by 60% for U.S. subscribers who want both services, citing the costs to acquire and deliver films and TV shows. Netflix stated:

> "Given the long life we think DVDs by mail will have, treating DVDs as a $2 add-on to our unlimited streaming plan neither makes great financial sense nor satisfies people who just want DVDs."

77. Customer reaction to the price increase was almost uniformly negative.

78. On July 25, 2011, Netflix issued a press release announcing its second quarter 2011 financial results. The Company reported net income of $68 million, or $1.26 diluted EPS, and revenue of $789 million for the second quarter ended June 30, 2011. The Company further reported over 25 million global subscribers for the second quarter. The release further stated in part:

> In Q3 we will see only the negative impact of the pricing change, given that the announcement was early in the quarter and that the increases won't take effect until late in the quarter (September 15th on average). We expect domestic net additions in Q3 to be lower than the previous year Q3, and because of the timing of the price change, revenues will only grow slightly on a sequential basis.
>
> In Q4, we expect domestic net additions to return to a pattern of year-over year growth while revenue will reflect a full quarter's impact of the pricing changes, which could result in Q4 being our first billion dollar global revenue quarter, driven by strong U.S. performance.
>
> While we expect our revenue to increase in Q4 from this pricing change, we are still targeting a 14% domestic operating margin because we will continue to increase our spending on streaming content, ensuring the service remains by far the best value out there when it comes to enjoying instant, on-demand movies and TV shows.

79. After releasing its second quarter 2011 financial results on July 25, 2011, Netflix hosted a conference call with analysts, investors and media representatives. In discussing the pricing changes, defendants stated:

> [HASTINGS:] Like any customer-driven organization, we feel bad about having customers upset with us, but we feel great about the amazing new content we're going to be able to license in the fourth quarter and next year, which will further propel our growth and our subscriber satisfaction.... And it's going to allow us to have just fantastic streaming content going forward.

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<center>*          *          *</center>

[ANALYST:] Given your relatively modest cash position, relative to the size of checks you're writing for content, and the success you're having with that content investment, what is the rationale of buying back stock? Given the multiple you get for subs, wouldn't you generate more value by investing in adding subs versus buybacks?

<center>*          *          *</center>

[WELLS:] So we have three legs, basically, of investment. One is our streaming content investment. One is our marketing. And one is our earnings target, basically putting money towards - back to investors. And setting that 14% operating margin - domestic operating margin target allows us to set basically a content spend and a marketing spend. And so how we think about cash relative to the buyback is independent of how much we spend on marketing. And I'd say how we approach the buyback is what could we do with that cash as an alternative use? Should we hold it as an insurance policy, or should we return it to shareholders and a buyback is the most efficient way to do that.

80.   On September 1, 2011, following the market close, Starz announced it was pulling its content from Netflix as a result of failed negotiations. Starz had represented some of Netflix's most valuable content.

81.   Netflix's stock dropped $20.16 per share on this news.

82.   On September 15, 2011, Netflix issued a press release announcing an update to its third quarter 2011 guidance. Netflix lowered its third quarter 2011 domestic subscriber estimates, expecting to end the third quarter with 21.8 million domestic streaming subscribers and 14.2 million U.S. DVD subscribers, down from its prior forecast of 22 million and 15 million, respectively. More significantly, Netflix lost a million subscribers almost immediately upon its price increases becoming effective.

83.   On this news, Netflix's stock collapsed $39.46 per share to close at $169.25 per share on September 15, 2011, a one-day decline of nearly 19% on volume of 21 million shares.

84.   The stock dropped even further when the Company announced on September 19, 2011, that it would begin charging separately for the two services and raised prices as much as 60%, a move that was poorly received among subscribers. The streaming service would retain the Netflix name, while the DVD service would be renamed Qwikster

<center>32</center>

<center>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</center>

85.   Netflix's stock dropped to $130.03 per share on this news, a nearly 44% decline from early September 2011.

86.   On October 24, 2011, Netflix issued its third quarter 2011 shareholder letter in which it reported a net loss of 810,000 U.S. subscribers, translating into a cumulative loss of 5.5 million subscribers. The subsequently filed Form 10-Q revealed that Netflix's obligations for content over the coming years had skyrocketed to $3.5 billion, with $2.8 billion due within three years.

87.   These disclosures caused Netflix's stock to collapse from $118.84 per share on October 24, 2011 to $80.86 per share on October 27, 2011, on volume of 76 million shares over three consecutive days.

88.   On November 21, 2011, Netflix announced plans to raise $400 million by issuing debt and selling its stock, a tacit acknowledgement that the stock buyback program was strategically flawed and had cost the Company cash that it desperately needed.  The move raised new fears among analysts about Netflix's financial strength as it braced for losses in the following year.  It would be Netflix's first annual loss in a decade.

89.   On December 22, 2011, Netflix announced that Hastings's stock option awards will be cut by 50% to $1.5 million in 2012.  His base salary remains unchanged at $500,000.

90.   The true facts about Netflix's cash needs and future prospects, which were known by defendants, but concealed from the investing public, were as follows:

(a)   Netflix had short-term contracts with content providers and defendants were aware that the Company would have to either renegotiate the contracts in 2011 at much higher rates which would require additional cash which the Company no longer had or forgo the valuable content from those providers thereby further alienating their customer base;

(b)   Content providers were already demanding much higher license fees, which would dramatically alter Netflix's business and cash flow;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    (c)    Defendants recognized that Netflix's pricing would have to dramatically

2 increase to maintain profit margins given the streaming content costs they knew the Company

3 would soon be incurring; and

4    (d)    Netflix was not on track to achieve the earnings forecasts made by and for

5 the Company for 2011.

### DAMAGES INCURRED BY NETFLIX

7    91.    As a result of the Individual Defendants' improprieties, Netflix spent vast amounts of

8 cash to repurchase stock at excessive prices even though it was clear that but for the stock

9 repurchases, Netflix share price could not be sustained and that cash being used by the Company

10 for the stock repurchases was better spent by the Company to obtain quality content, which it was

11 already aware would be more expensive than in the past. The Individual Defendant's decision to

12 continue with the ill-advised stock repurchases is even more questionable given they actually

13 profited from the decision.

14    92.    Further, as a direct and proximate result of the Individual Defendants' actions, Netflix

15 will continue to expend significant sums of money, given it funded its buyback program with

16 bonds that pay 8.5% interest.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

18    93.    Plaintiff brings this action derivatively in the right and for the benefit of Netflix to

19 redress the breaches of fiduciary duty and other violations of law by the Individual Defendants as

20 alleged herein.

21    94.    Plaintiff will adequately and fairly represent the interests of Netflix and its

22 shareholders in enforcing and prosecuting its rights, and it has retained counsel experienced in

23 prosecuting this type of action.

24    95.    As a result of the facts set forth herein, Plaintiff has not made any demand on the

25 Netflix Board of Directors to institute this action against the Individual Defendants. Such demand

26

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1 would be a futile and useless act because the Board is incapable of making an independent and
2 disinterested decision to institute and vigorously prosecute this action.

3     96. At the time this action was initiated, the Board was comprised of seven directors,
4 including defendants Hastings, Barton, Battle, Giancarlo, Haley, Hoag, and Mather. Plaintiff did
5 not make any demand on the Board to institute this action because such a demand would have been
6 futile, wasteful, and a useless act, particularly for the following reasons:

7     (a)    As a result of the actions complained of herein, Director Defendants Hastings,
8 Giancarlo, Hoag, Haley, Barton, and Battle each received a financial benefit in that each and all of
9 them were able to redeem stock options at a much greater profit than they would have but for the
10 stock repurchase program they directed Netflix to undertake. Moreover, by colluding with each
11 other and the other Individual Defendants, each of defendants Hastings, Giancarlo, Hoag, Haley,
12 Barton and Battle has demonstrated that they are unable and unwilling to act independently of the
13 other Individual Defendants. Consequently, each of defendants Hastings, Giancarlo, Hoag, Haley,
14 Barton and Battle is incapable of independently and disinterestedly considering a demand to
15 commence and vigorously prosecute this action;

16     (b)    Defendants Haley, Battle, and Hoag are also incapable of independently and
17 disinterestedly considering a demand to commence and vigorously prosecute this action given that
18 they serve on the Board's Compensation Committee with each other, and all profited from the
19 alleged wrongdoing;

20     (c)    Defendants Haley and Giancarlo are incapable of independently and disinterestedly
21 considering a demand to commence and vigorously prosecute this action given that they serve on
22 the Board's Audit Committee together, and also both benefited from the alleged wrongdoing;

23     (d)    Likewise, defendant Mather serves on the Audit Committee with defendants Haley
24 and Giancarlo and is incapable of independently and disinterestedly considering a demand to
25 commence and vigorously prosecute this action;

26
27                                        35

28                 VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(e) Defendants Hoag and Barton are also connected to each other, although Netflix does not seem interested in publicizing the fact, and are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action. Defendant Barton is a co-founder of Zillow, Inc., where he is now Executive Chairman of the Board of Directors. While not contained in defendant Hoag's Netflix bio, defendant Hoag also sits on the Zillow, Inc. Board of Directors;

(f) In addition, defendant Battle is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action given that he and defendant Kilgore both serve on the Board of Directors of Linkedin Corp. Once again, their bios on the Netflix website omit this connection.

(g) Furthermore, defendant Hoag is a founding General Partner at Technology Crossover Ventures, a private equity and venture capital firm. He has been involved in a large number of technology investments including Actuate Software, Ariba Technologies, Altiris, BlueCoat Systems, C|Net, CompUSA, Encompass, EXE Technologies, Expedia, Fandango, Facebook, Groupon, Intuit, Macromedia, Netflix, NETCOM, ONYX Software, PictureTel, Pure Software, RealNetworks, SpringStreet, Sybase, TechTarget, Vacationspot.com, Viant, and Zillow among others. Pure Software was a Company founded by defendant Hastings in 1991. In 1996, Pure Software merged with Atria to form Pure Atria Corporation, which was acquired by Rational Software in 1997 and provided Hastings with the capital he needed to start Netflix. According to the Technology Crossover Ventures website, the company is currently funding Netflix and Zillow. *See* http://www.tcv.com/team/index.php4?25. Consequently, defendant Hoag is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action, a point driven home by this 2001 statement by defendant Hoag regarding Technology Crossover Ventures' investment in Netflix, "[it] was a bet on Reed." *See* ; http://news.cnet.com/2100-1023-277143.html;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(h)     Defendant Haley is a co-founder of Redpoint Ventures, a venture capital firm, and has been a Managing Director of the firm since October 1999. According to Redpoint's website, Redpoint typically invests $1M to $10M in early stage companies ranging from concepts to companies with products already in market. Redpoint's early-stage investments include defendant Hastings' initial start up, Pure Software, and Netflix. Redpoint also invested in Ask.com f/k/a Ask Jeeves, of which defendant Battle was previously Executive Chairman of the Board of Directors. Defendant Battle was also Chief Executive Officer of Ask Jeeves from 2000 to 2003. Consequently, defendant Haley is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action;

(i)     Additionally, defendant Barton is a Venture Partner with Benchmark Capital. Benchmark Capital is a venture capital firm also responsible for the early stage funding. According to the Benchmark website, Benchmark has financially backed Open Table, Inc., whose Board of Directors defendant Battle currently sits on, and Shopping.com, Inc., whose Board of Directors defendant Mather sat on until it was acquired by eBay Inc. in 2005. *See* http://www.benchmark.com/companies/. Benchmark Capital was also a major investor in Webvan.com, the former employer of defendant Hyman. *See* http://www.fundinguniverse.com/company-histories/Benchmark-Capital-company-History.html. Defendant Hyman also held the position of general counsel at Webvan. Finally, defendant Hastings and Benchmark Capital General Partner, Bill Gurley, are both listed as "Partners" in Rocketship Education, a national network to eliminate elementary-age gap in high poverty neighborhoods. *See* http://rsed.org/index.php?page=partners. Consequently, defendant Barton is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants;

(j)     At all times relevant hereto, Netflix's Code, which applies to Netflix's officers and directors, stated that "Netflix Parties are expected to act and perform their duties ethically and honestly and with the utmost integrity. Honest conduct is considered to be conduct that is free

1  from fraud or deception.  Ethical conduct is considered to be conduct conforming to accepted

2  professional standards of conduct.  Ethical conduct includes the ethical handling of actual or

3  apparent conflicts of interest between personal and professional relationships . . . A conflict of

4  interest exists where the interests or benefits of one person or entity conflict or appear to conflict

5  with the interests or benefits of the Company."  The Individual Defendants, including defendants

6  Hastings, Barton, Battle, Giancarlo, Haley, Hoag, and Mather violated the code by knowingly

7  wasting the Company's assets, while at the same time reaping financial benefits, by repurchasing

8  Netflix stock at inflated prices.  The failure of the Director Defendants to adhere to the Code lead

9  directly to the waste of corporate assets suffered by Netflix.  Consequently, each of the Director

10  Defendants faces a substantial likelihood of liability for the claims asserted in this action;

11       (k)    At times relevant hereto, defendants Giancarlo, Haley, and Mather were members

12  of the Audit Committee of the Board.  As members of the Audit Committee defendants Giancarlo,

13  Haley, and Mather were charged with assisting the Board in fulfilling its oversight responsibility,

14  monitoring financial risk exposure, and monitoring corporate compliance efforts.   Defendants

15  Giancarlo, Haley, and Mather utterly and consciously disregarded these duties with respect to the

16  Company's stock repurchase program.   The Audit Committee and its members, among other

17  things, failed to ensure that the Company was protecting its own assets and put the financial

18  concerns of themselves and their colleagues above those of the Company.   Accordingly,

19  defendants Giancarlo, Haley, and Mather, each as members of the Audit Committee, face a

20  substantial likelihood of liability for the claims asserted in this action;

21       (l)    Defendant Hastings could not possibly be independent given his positions with the

22  Company.   Defendant Hastings is the Company's Chief Executive Officer and President.

23  Defendant Hastings derives the majority of his income from his positions with Netflix, and equally

24  important, a majority of defendant Hastings' income comes in the form of stock options and he

25  directly benefitted from the inflated Netflix stock prices achieved by the Company's stock

26  repurchases;

27

28

---

38

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    (m)    Defendant Hastings could also not possibly be independent given his longstanding

2  relationships with defendants Hunt and McCord.  As noted in an article run by CNN Money,

3  "[W]hen he was 30, Hastings started a company called Pure Software.  Neil Hunt was there in the

4  early days of Pure, as was Patty McCord, who now heads human resources at Netflix."  *See*

5  http://tech.fortune.cnn.com/2010/11/18/reed-hastings-leader-of-the-pack/;

6    (n)    Defendant Kilgore cannot be independent given her extensive direct involvement in

7  selling the improperly granted stock options, as she is both directly interested in the challenged

8  transactions and faces a substantial risk of liability as a result of her engagement in the challenged

9  transactions.  Moreover, Kilgore served as the Company's Chief Marketing Officer from March

10 2000 to January 21, 2012.  During her tenure she served alongside defendants Hastings, Wells,

11 Hunt, Hyman, and McCord.  She also serves on the Linkedin Corporation Board of Directors with

12 defendant Battle; and

13    (o)    Finally, defendants Hastings, Barton, Battle, and Kilgore all attended Stanford

14 University and have long standing personal relationships  and are incapable of independently and

15 disinterestedly considering a demand to commence and vigorously prosecute this action.

16                                        **COUNT I**

17            **Against All Individual Defendants for Breach of Fiduciary Duty**

18    97.    Plaintiff incorporates by reference and realleges each and every allegation contained

19 above, as though fully set forth herein.

20    98.    The Individual Defendants owed and owe Netflix fiduciary obligations.  By reason of

21 their fiduciary relationships, these defendants owed and owe Netflix the highest obligation of good

22 faith, fair dealing, loyalty and due care.

23    99.    The Individual Defendants, and each of them, violated and breached their fiduciary

24 duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

25    100. Each of the Individual Defendants had actual or constructive knowledge of the

26 misconduct alleged herein, including that they wasted corporate assets by buying back stock at

27                                           39

28 _____
   VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  prices that were unsustainable; especially in the face of information known to the Individual

2  Defendants. Moreover, the sole reason for the Individual Defendants' improper actions was for

3  the Individual Defendants' own economic benefit. These actions could not have been a good faith

4  exercise of prudent business judgment to protect and promote the Company's corporate interests.

5       101. As a direct and proximate result of the Individual Defendants' failure to perform their

6  fiduciary obligations, Netflix has sustained significant damages. As a result of the misconduct

7  alleged herein, the Individual Defendants are liable to the Company.

8       102. Plaintiff, on behalf of Netflix, has no adequate remedy at law.

9                                    **COUNT II**

10              <u>**Against All Defendants for Abuse of Control**</u>

11      103. Plaintiff incorporates by reference and realleges each and every allegation contained

12  above, as though fully set forth herein.

13      104. Defendants' misconduct alleged herein constituted an abuse of their ability to control

14  and influence Netflix, for which they are legally responsible.

15      105. As a direct and proximate result of defendants' abuse of control, Netflix has sustained

16  and continues to sustain significant damages. As a result of the misconduct alleged herein,

17  defendants are liable to the Company.

18                                   **COUNT III**

19              <u>**Against All Defendants for Corporate Waste**</u>

20      106. Plaintiff incorporates by reference and realleges each and every allegation contained

21  above, as though fully set forth herein.

22      107. As a result of the foregoing misconduct, defendants have caused Netflix to waste

23  valuable corporate assets.

24      108. As a direct and proximate result of defendants' corporate waste, Netflix has sustained

25  and continues to sustain significant damages. As a result of the misconduct alleged herein,

26  defendants are liable to the Company.

27                                        40

28

## COUNT IV

### Against All Defendants for Unjust Enrichment

109. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Netflix. Defendants were unjustly enriched as a result of the salary, fees, stock options and other payments they received while breaching their fiduciary duty owed to Netflix.

111. Plaintiff, as a shareholder of Netflix, seeks restitution from defendants, and each of them, and seeks an Order of this Court disgorging all profits, benefits, and other improper payments obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

112. As a result of defendants' unjust enrichment, Netflix has been injured and is entitled to damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.  Declaring that Plaintiff may maintain this action on behalf of Netflix and that Plaintiff is an adequate representative of the Company;

B.  Declaring that defendants have breached their fiduciary duties to Netflix;

C.  Determining and awarding to Netflix the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.  Determining and awarding to Netflix exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

41

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

E.    Awarding Netflix restitution from defendants, and each of them;

F.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

G.    Granting such other and further equitable relief as this Court may deem just and proper.

<div align="center">

**JURY TRIAL DEMANDED**

</div>

Plaintiff hereby demands a trial by jury.

Dated:  February 13, 2012        **FARUQI & FARUQI, LLP**

By: _____
       VAHN ALEXANDER (167373)

CHRISTOPHER HAYES (277000)
10866 Wilshire Boulevard, Suite 1470
Los Angeles, California 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
Email: valexander@faruqilaw.com
       chayes@faruqilaw.com

-and-

MICHAEL J. HYNES
SANDRA G. SMITH
101 Greenwood Avenue, Suite 600
Jenkintown, Pennsylvania 19046
Telephone:  (215) 277-5770
Facsimile: (215) 277-5771
Email:  mhynes@faruqilaw.com
       ssmith@faruqilaw.com

<div align="center">

42

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

</div>

-and-

BETH A. KELLER
NICHOLAS W. MOYNE
369 Lexington Avenue, 10th Floor
New York, New York 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331
Email: bkeller@faruqilaw.com
        nmoyne@faruqilaw.com


*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Natalie Gordon, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified Shareholder Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 12, 2012

*Natalie Gordon*

Natalie Gordon